

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-23-00544-CV

**IN THE INTEREST OF S.D.T.**, a Child

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 21-09-27336-CV
Honorable Robert J. Falkenberg, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: December 13, 2023

AFFIRMED

This appeal arises from the trial court's order, signed after a bench trial, that terminates the parental rights of appellant E.D.T. ("Father"), the biological father of S.D.T. ("Child").[1]    On appeal, Father raises three issues, which we construe as five.   In Father's first four issues, he argues that the evidence is legally and factually insufficient to support the trial court's findings that: (1) Father allowed Child to remain in a physically or emotionally dangerous condition or surrounding; (2) Father engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangers the physical or emotional well-being of Child; (3) Father failed to comply with specific provisions of a court order; and (4) termination of Father's parental rights is in the best

---

[1] We refer to S.D.T. and S.D.T.'s family members by pseudonyms in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

interest of Child.  *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (O), 161.001(b)(2).  Father also argues that (5) the trial court abused its discretion in making its conservatorship finding upon a legally and factually insufficient termination order.  *See id*. § 153.131(a).  We affirm.

### I. BACKGROUND

In September 2021, the Texas Department of Family and Protective Services (hereinafter the "Department") initiated the underlying proceeding by filing a petition to terminate the parental rights of Father and S.C. ("Mother") to Child, the couple's newborn daughter.  Thereafter, the trial court signed an "Order for Protection of Child in an Emergency" that, among other things, appointed the Department as Child's temporary managing conservator.  Both parents executed a family service plan, and it was adopted and incorporated into a court order.  Meanwhile, Child was placed with her maternal aunt ("Aunt").  In October 2022, Aunt filed a petition in intervention that requested an order terminating Father's and Mother's parental rights to Child and appointing Aunt and the Department as Child's joint managing conservators.  Aunt's petition alleged that section 102.003(a)(9) and (12) of the Texas Family Code conferred standing on her.  *Id*. § 102.003(a)(9), (12).[2]  Ultimately, the Department's termination petition and Aunt's petition in intervention proceeded to a three-day bench trial.  Each parent was represented by separate counsel at trial.  On the final day of trial, Mother executed a voluntary relinquishment of her parental rights.  At the trial's conclusion, the trial court found by clear and convincing evidence that: (1) Father allowed Child to remain in a physically or emotionally dangerous condition or surrounding; (2) Father engaged in conduct or knowingly placed Child with persons who engaged in conduct which

---

[2] Section 102.003(a)(9) and (12) provide that "[a]n original suit may be filed at any time by (9) a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition; [or] (12) a person who is the foster parent of a child placed by the Department of Family and Protective Services in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition[.]"  TEX. FAM. CODE ANN. § 102.003(a)(9), (12).

endangers the physical or emotional well-being of Child; (3) Father failed to comply with specific provisions of a court order; and (4) termination of Father's parental rights is in the best interest of Child. *See id*. §§ 161.001(b)(1)(D), (E), (O), 161.001(b)(2). The trial court appointed the Department as Child's permanent managing conservator. Father timely appealed from the termination order.[3]

## II. DISCUSSION

### A. Standard of Review

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest. *See id.* § 161.001(b)(1), (2). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id*. at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited

---

[3] The termination order also terminated the parental rights of Mother. She, however, did not appeal the termination of her parental rights and is not a party to this appeal.

in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

**B.      Law on Endangerment**

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D).  Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  *Id*. at § 161.001(b)(1)(E). Endangerment means to expose to loss or injury; to jeopardize.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *accord In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment.  *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *3 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.).  Subsection (D) concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment.  *Id*. (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).  Under subsection (E), the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission.  *In re J.T.G.*, 121 S.W.3d at 125.

**C.      Endangerment Evidence**

On March 31, 2018, Father committed the offense of possession of a controlled substance, a third-degree felony.  *See generally* TEX. HEALTH & SAFETY CODE ANN. § 481.115(c).  Father

received deferred adjudication and community supervision for this offense, and he admitted to using methamphetamine when he was charged. On March 14, 2020, Father assaulted his father ("Paternal Grandfather"). Father blamed the assault on Paternal Grandfather's bipolar disorder, but he also admitted that his methamphetamine use played a role in him assaulting Paternal Grandfather.

The record is unclear as to when exactly Father and Mother began dating. Mother described her relationship with Father as "here and there" while she was pregnant with Child. Meanwhile, the State sought to revoke Father's community supervision because of, among other things, Father's assault on Paternal Grandfather and his testing positive for methamphetamine on February 10, 2020, and February 24, 2020. In August 2021, while Mother was eight months pregnant with Child, Father's community supervision was revoked. He was incarcerated during Mother's final month of pregnancy.

In early September 2021, Joe Sanchez, an investigator with Child Protective Services ("CPS") received a report that Mother and Child had tested positive for amphetamines and "there was concern for the baby having withdrawals." Sanchez began investigatng the report by visiting the hospital, confirming that the drug test results showed Mother and Child had indeed tested positive for amphetamines, and observing Child. Sanchez noticed that Child had a "very high-pitched squeaking cry, and she was shaking uncontrollably." He also noticed that Child was irritable and that her eyes were "rolling back a little bit." Having investigated numerous cases of a child born to a mother who abused methamphetamine while pregnant, Sanchez believed that Child was undergoing withdrawal symptoms. Sanchez spoke with Mother, and she admitted to using methamphetamine "throughout the first and second trimester of her pregnancy" and even two days before giving birth to Child. Sanchez reviewed Mother's CPS history, and he learned that Mother's two older children live with their maternal grandmother. Sanchez interviewed

Father while he was incarcerated. Father told Sanchez that he did not know Mother had abused methamphetamine while she was pregnant with Child.

Based on Sanchez's investigation, the Department sought to remove Child from Mother's custody and placed her with Aunt. Sanchez recommended removal because Mother continually used drugs, she was "really unstable at the time," and "didn't have a consistent living environment." The night Aunt brought Child to her home from the hospital, Child's eyes rolled back, she had tremors, and she cried throughout the night. Aunt stayed up with Child, holding her and trying to comfort her. Aunt believed that these were symptoms of Child's methamphetamine withdrawal, and they persisted for a couple of months. Child received care from a physical therapist, a speech therapist, and a developmental specialist. Aunt could not recall Father attending any of Child's medical appointments.

On October 7, 2022, Father was released from jail and placed on parole until July 2025. While incarcerated and as part of Father's sentence, he completed a substance abuse treatment program, group therapy, individual therapy, and anger management education. Since Father's release from jail, he has been employed by his uncle as a construction worker, consistently tested negative for controlled substances, and completed every individual service contained in his service plan. However, in January 2023, approximately sixty days before trial, the Department requested that the family service plan be amended to include couples counseling. The trial court agreed, and it ordered couples counseling. At the time of trial, Mother and Father had not completed couples counseling.

Since Father's release, he and Mother have renewed their relationship. Father testified that he would like to share a home with Mother. However, according to Katerina Lewis, a case worker with the Department, Father's parole officer advised him that it was too soon for him to cohabitate with Mother. Lewis expressed three interrelated concerns regarding Father. First, Lewis was

concerned about Mother and Father being in a relationship because of their history of drug use together.  In Lewis's experience, if one parent is having a problem with sobriety, they both will have a problem.  Second, Lewis was concerned that Mother and Father have not completed couples counseling because "couples counseling [i]s important so they could address being — co-parent[s]."  Third, Lewis was concerned that Father downplays his use of methamphetamine.  Father, according to Lewis, believes that "he can just use it and then stop whenever."

Aunt expressed concern for Child if she were to be returned to Mother.  Mother, according to Aunt, has a total of four children, but she has custody of none.  In Mother's prior relationship, she was the victim of domestic violence but "she also did throw in a couple of hits."  Aunt described that when Mother "can't control how she's feeling . . . she starts with drinking, and then it spirals from there."  In observing Mother's interactions with her other three children, Aunt noted that "[s]he can't control them, and she yells and screams at them a lot.  She just gets very agitated with them."  Aunt has seen Mother relapse "[a] lot."

Aunt and Foster Father testified that Mother admitted she and Father purchased methamphetamine together.  Foster Father specifically testified:

Q. And how are you associated with [Child]?

A. I am her foster dad.

Q. Okay, and how long has she lived in your home?

A. For about a year and a half now.

Q. Okay, would you say around September of 2021 she was placed in your home?

A. Yes.

Q. Okay, and how old is [Child] now?

A. She's 18 months.

Q.	18 months.  Okay.  To your knowledge how did this case start?

A.	Because the parents were — I know — I know that they were using.

Q.	Okay.  You know what substance they were using?

A.	Methamphetamines.

Q.	Okay, and prior to placement in your home, did you ever have contact with [Mother]?

A.	Yes.

Q.	Okay, and when — when did you have contact with her?

A.	The day that we were supposed to go pick up her — pick up the baby from the hospital.

Q.	Okay, and could you explain to the Court what happened that day?

A.	So the mom didn't have a ride to the hospital, so CPS workers had asked us if we could give her a ride.  So I — I think they — they needed her to sign documents, and it was also going to be her first visit, and so me and [Aunt] had to give her a ride over to the Hondo hospital, and on the way over there — on the way over there [Mother] was talking, and just yes, so . . . . [ellipses in original]

Q.	Okay, and so what — what — what did you guys discuss in the — in the ride over to the hospital?

A.	I tried to — I tried to keep quiet, but she was saying that — she was going on saying something about how her and [Father] would go hang out with her friends, and they would go get what's called jale, and we had asked what that meant, and she said, It was, like, another — another word or a slang for the — the drug.

Q.	Okay, and — and do you know why she was talking about — about that with you guys?

A.	Not that I can remember.

Q.	Okay.  Was she acting odd at — at any point during that ride to the hospital?

A.	A little — a little anxious.  She —

Q.	Okay.

A.    She did most of the talking.

Q.    Okay, and [Mother] admitted to you that she would buy methamphetamines with [Father]?

A.    Yes.

Austin Jaramillo, a police officer with the Dilley Police Department, testified that on March 23, 2023,[4] he responded to a report of a "verbal disturbance" between Mother and another female customer at a restaurant. Officer Jaramillo also testified that he received a call that a vehicle matching the description of Mother's had been involved in a hit-and-run accident. Officer Jaramillo proceeded to the area of the hit-and-run, and he observed Mother's vehicle commit several traffic violations. Officer Jaramillo initiated a traffic stop. He then noticed that Mother's speech was slurred and that she was not able to focus, and he arrested her.

**D.    Endangerment Analysis**

In Father's first and second issues, he contends that the evidence is legally and factually insufficient to support the trial court's findings under subsections (D) and (E). Specifically, Father argues that: (1) his past criminal conduct is far removed; (2) he has tested negative for drugs during the pendency of the termination proceeding; (3) he has had no prior investigations by the Department; (4) he completed all requirements in the original family service plan; (5) he has not engaged in domestic violence with Mother; and (6) he did not know about Mother's use of methamphetamine while she was pregnant with Child. Father argues that these positive pieces of evidence render the trial court's endangerment findings legally and factually insufficient.

Several of Father's arguments focus on his recent improvement. However, the Texas Supreme Court has written that "[w]hile the recent improvements made by [a father in a

---

[4] We note that February 28, 2023, was the first day of the three-day bench trial. The trial resumed on March 8, 2023, and it concluded on April 4, 2023.

termination proceeding] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Indeed, "[a]n offense committed by a parent before the birth of the parent's child 'can be a relevant factor in establishing an endangering course of conduct.'" *In re E.J.M.*, 673 S.W.3d 310, 331 (Tex. App.—San Antonio 2023, no pet.) (en banc) (quoting *In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012)). Moreover, "[t]he specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *Id.* (quoting *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.)). Additionally, evidence of criminal conduct, convictions, and imprisonment and their effect on the parent's life and ability to parent may establish an endangering course of conduct. *Id.*

Under *In re J.O.A.*, 283 S.W.3d at 346, it was within the trial court's discretion to consider three specific aspects of Father's "long history of drug use and irresponsible choices." First, Father's use of methamphetamine. Father was convicted for the offense of possession of a controlled substance on March 31, 2018. *See Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."). While on community supervision, Father tested positive for methamphetamine on February 10, 2020 and February 24, 2020. Lewis articulated two specific concerns regarding Father's drug use. First, Lewis was concerned about Mother and Father being in a relationship because their history of drug use together increases the likelihood of a relapse. Second, Lewis was concerned that Father downplays his use of methamphetamine.

Lewis's concerns regarding Father and Mother being able to maintain sobriety while in a relationship blends into the second aspect that the trial court may have considered because

"[e]ndangerment can include knowledge that a child's mother abused drugs while pregnant, the father knew, and the father did not try to stop her." *E.J.M.*, 673 S.W.3d at 330. Foster Father's testimony that "the parents were — I know — I know that they were using" methamphetamine coupled with his recollection of Mother admitting methamphetamine use and stating that she and Father would buy methamphetamine support a reasonable inference that Father could have known Mother used methamphetamine while she was pregnant and did not try to stop her. *Id*. at 330–31.

Third, "[d]omestic violence may be considered evidence of endangerment." *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."). The trial court may have considered Father's March 14, 2020 assault on Paternal Grandfather as endangering conduct. *Id*.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude a reasonable factfinder could have formed a firm belief or conviction that Father "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Thus, the evidence is legally sufficient to support this finding. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's finding under subsection 161.001(b)(1)(E). Father's second issue is overruled.[5]

---

[5] Because there is sufficient evidence of subsection (E) endangerment, we need not address Father's first and third issues, which challenges the sufficiency of the evidence to support the trial court's findings that Father committed the predicate acts listed in subsections (D) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

**E.    Law on Best Interest**

It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. In a best interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[6] The set of factors is not exhaustive, and no single factor is necessarily dispositive of the issue. *Id*. at 372; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, we also consider the factors set forth in section 263.307(b) of the Family Code. *Id*. § 263.307(b). Additionally, evidence that proves one or more statutory grounds for termination may be probative of a child's best interest, but it does not relieve the Department and Aunt — in this case — of their burden to prove best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see also* TEX. FAM. CODE ANN. § 102.003(a)(9), (12) (statutory provisions on which Aunt bases her standing upon).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, a factfinder may measure a parent's future conduct by his past conduct in determining whether termination of parental rights is in the child's best interest. *Id*. In analyzing the evidence within the *Holley* framework, evidence of each *Holley*

---

[6] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

factor is not required before a court may find that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27. Moreover, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the best interest of the child, not the best interest of the parent. *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.).

**F.      Best Interest Analysis**

### 1.      *Child's Desires*

Under the first *Holley* factor, Child is too young to express her desires. When a child is too young to express her desires, the factfinder may consider whether the child has bonded with her caregivers, is well-cared for by them, and whether the child has spent minimal time with a parent. *In re E.J.M.*, 673 S.W.3d at 334 (citing *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied)). At the time of trial, Child was eighteen months old, and she had lived with Aunt and Foster Father since being discharged from the hospital. Aunt described staying up with Child all night holding her and trying to comfort her as Child suffered from what she believed to be methamphetamine withdrawal symptoms. Since being released from jail in October 2022 until the last day of trial April 4, 2023, Father has had a total of eight visits with Child. None of Father's visits were overnight. During Father's visits with Child, Lewis observed that Child seemed happy with Father and played with him.

Given Father's limited contact with Child and Child's continuous care by Aunt and Foster Father since the day she was born, the factfinder may have reasonably formed a firm belief or conviction that the first *Holley* factor was neutral or slightly favored termination. *See In re J.M.G.*, 608 S.W.3d 51, 57 (Tex. App.—San Antonio 2020, pet. denied) (when child is too young to express a desire, factfinder may consider whether child is bonded with caregiver and well-cared for).

**2.** ***Child's Present and Future Emotional and Physical Needs and Present and Future Emotional and Physical Danger to Child.***

The second *Holley* factor focuses on the child's present and future emotional and physical needs. Father testified as to his desire to provide for Child's needs. Specifically, he testified:

I love her very much. She's my only daughter. I'll do anything for that little girl. I would like to know all her medicals and be up to date so I can show y'all that I could help her out with all of that. I know I can support her. And I work a full-time job every day, and so I don't have no problem taking care of her. I would love to be in her life because I have not seen her since I've been out like — I missed her day being born. I missed a whole year out of her life. I want her to be in my life as she grows and be a father figure to her, guide her, you know, build a — help her out.

She knows me. Every time I visit her, she smiles and she runs up to me with open arms and I pick her up. And I give her her toys to play with. I don't let her play; I play with her. When she's hungry, I'll feed her. I won't let her eat; I'll feed her myself.

Lisa Cobb, a licensed professional counselor who provided Father with counseling, testified that she does not see how Father could be a danger to Child's physical or emotional well-being.

However, there was evidence that would have allowed the factfinder to have reasonably formed a firm belief or conviction that Father would be unable to provide for Child's physical and emotional needs. Lewis testified that Father did not reach out to determine Child's medical needs. Aunt testified that she could not recall Father attending any of Child's medical appointments. Aunt also testified that Child receives care from physical and speech therapists and receives treatment from a developmental specialist. *See E.J.M.*, 673 S.W.3d at 334 ("[T]he jury could infer that [father] would be unable to provide for [child's] physical needs based on his failure to identify her current providers and his failure to communicate with her doctors or foster parents about [child's] medical needs.").

The third *Holley* factor concerns present and future emotional and physical danger to the Child. Father's history of drug use and domestic violence that we analyzed under the predicate ground is also relevant to our best interest analysis. *See C.H.*, 89 S.W.3d at 28 (providing that evidence that establishes a predicate finding under section 161.001(b)(1) may be probative of the best-interest issue); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (considering mother's admission to using methamphetamine around the time of child's removal under the needs of and danger to the child factor in the best-interest analysis); *In re R.J.*, 579 S.W.3d 97, 116 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("Evidence of domestic violence in the home is supportive of a trial court's best-interest finding under the third, fourth, and seventh *Holley* factors: the emotional and physical danger to the child now and in the future, parental abilities, and stability of the home."). Father's March 31, 2018 conviction for the offense of possession of a controlled substance, his admission that he was using methamphetamine when he was charged, and his testing positive for methamphetamine on February 10, 2020, and February 24, 2020, and Father's March 14, 2020 assault on Paternal Grandfather weigh in favor of termination under the third *Holley* factor. *See E.R.W.*, 528 S.W.3d at 266.

### 3.  *Parental Abilities*

The fourth *Holley* factor concerns the parental abilities of the individuals seeking custody. While incarcerated, Father completed a substance abuse treatment program, group therapy, individual therapy, and anger management education. He also completed all services in his court-ordered service plan except for couples counseling. Since being released from jail, Father has had a total of eight visits with Child. In contrast, Aunt cared for and comforted Child while she underwent what she believed to be symptoms of methamphetamine withdrawal. Additionally, Aunt has continually cared for Child from her discharge from the hospital until the time of trial. This *Holley* factor is neutral or slightly favors termination.

### 4.      *Plans for the Child and Stability of the Home*

The sixth *Holley* factor is the plan for the child by the individuals or agency seeking custody, and the seventh *Holley* factor is the stability of the home or proposed placement.  At the time of trial, Father resided with his parents, including Paternal Grandfather.  Lewis had not conducted a home study on Father because she had "not had time to go look at where [Father] is living."  Cobb expressed no concern with Father residing in the same home as Paternal Grandfather.  Specifically, Cobb testified:

> Q.      And you said that you'd worked on domestic violence with his father.  What — what are you seeing with him in regards to his thought processes with — with what led to that incident?
>
> A.      I think now he has increased coping skills in what bipolar really is so that knowing to keep himself out of that situation or how to deescalate it.
>
> Q.      Okay.  So is his father bipolar?
>
> A.      As far as we know.  I — I have never seen a diagnosis.  I've never talked to the father, but I guess that's what led up to the situation, and it was a one and only thing that had happened.

In the Department's summation, it argued that "till this day we still have [Father] denying that responsibility and the domestic violence" by "telling his counselor that it's my dad's fault because he's bipolar."  It was within the trial court's discretion to consider Father's deflection of blame for his assault on Paternal Grandfather as support for an adverse inference regarding the stability of Father's home.  *Cf. E.J.M.* 673 S.W.3d at 331 (noting "[father] offered no excuse for his criminal behavior" and that the factfinder "could have disbelieved [father's] testimony" that "he did not intend to reoffend").

At the time of trial, Father was in a relationship with Mother, and he expressed an interest in living with Mother.  Lewis expressed concerns about Mother and Father being in a relationship because of their history of drug use together.  Aunt testified that she has seen Mother relapse "[a]

lot." Moreover, Officer Jaramillo detailed his interactions with Mother on March 23, 2023, expressed his opinion that Mother's driving was "unsafe for others driving . . . [on] the public roadway," and confirmed that Mother was cited for public intoxication.

In *In re K.L.M.*, 443 S.W.3d 101, 116–17 (Tex. 2014), the Texas Supreme Court held that a mother's tumultuous relationship with her mother — together with other evidence — was legally sufficient evidence to support the termination of the mother's parental rights under the best interest prong. The Court specifically noted:

> [W]e consider the plans for the child by [mother] and the stability of the home. While [mother] acknowledges that she cannot adequately provide for [child], she argues that termination of her parental rights was not in [child's] best interest because [grandmother] would help in raising [child]. DFPS, however, argues that the relationship between [grandmother] and [mother] was and is very tumultuous and would not ensure a stable home. The jury was made aware of [mother] and [grandmother's] strained relationship from testimony that [grandmother] sent [mother] away after [child] was born and that, since her teenage years, [mother] has never resided with her mother for an extended period of time. Additionally, DFPS testimony suggested that [grandmother] lacks the ability to provide a safe environment for [child] due to a past history of domestic violence and the possibility of drug usage. A DFPS supervisor testified that [grandmother's] home was not an appropriate placement as DFPS had been involved with the family long before [child's] birth for abuse allegations with [mother's] little brothers, though no action was ever taken. [Grandmother] testified that both she and [mother] suffer from bipolar disorder. Additionally, [mother] planned to live with[grandmother], creating a risk for more instability. Thus, these factors also weigh in favor of termination.

*Id*. at 116–17 (citation omitted). As in *K.L.M.*, the trial court may have found that Father's plan of living with Mother — coupled with Mother's history of drug use and her recent behavior observed by Officer Jaramillo — was evidence that Father could not provide Child with a stable home. *See id*.; *see also J.M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00435-CV, 2023 WL 213928, at *8 (Tex. App.—Austin Jan. 17, 2023, pet. denied) (mem. op.) (observing that self-serving "hypothetical" does not constitute evidence of concrete plans); *In re G.V.*, No. 14–02–00604–CV, 2003 WL 21230176, at *5 (Tex. App.—Houston [14th Dist.] May 29, 2003, pet.

denied) (mem. op.) (noting stability proposed placement promises "weigh[s] heavily in the court's finding that termination is in the best interest" of a child).

### 5. *Father's acts or omissions and any excuses*

The eighth *Holley* factor is whether Father's acts or omissions may indicate that the existing parent-child relationship is improper. Father's history of drug use and domestic violence tilt the eighth *Holley* factor in favor of termination. *See C.C. v. Tex. Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 219 (Tex. App.—Austin 2022, no pet.) (holding evidence of parent's recidivist drug use and absences were evidence of improper relationship); *In re M.C.L.*, No. 04-17-00408-CV, 2017 WL 5759376, at *6 (Tex. App.—San Antonio Nov. 29, 2017, no pet.) (mem op.) (noting factfinder may have considered "[f]ather's history of domestic violence, including threatening to kill [m]other after a visitation" in analyzing the eighth *Holley* factor). Father did not offer any excuses — only deflection — for his actions. *See Holley*, 544 S.W.2d at 372 (ninth *Holley* factor).

## E. Best Interest Disposition

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in Child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. While evidence as to Child's desires and Father's parenting abilities may have been neutral or weighed only slightly in favor of or against maintaining the parent-child relationship, the instability of Father's home, the inadequacy of Father's proposed placement, and the prospect of present and future emotional and physical danger to Child weigh in favor of termination. *See In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.) ("Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest — especially when

the evidence shows the parental relationship endangered the child's safety."). We further conclude that any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in Child's best interest. *See id*. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *see also In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014) (recognizing appellate court need not detail evidence if affirming termination judgment). Father's fourth issue is overruled.

## F.     Conservatorship

In Father's fifth issue, he contends that the trial court abused its discretion in making its conservatorship finding upon a legally and factually insufficient termination order. We review the trial court's appointment of a nonparent as sole managing conservator for an abuse of discretion, and we will reverse that appointment only if we determine it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Having determined the evidence is legally and factually sufficient to support the termination of Father's parental rights, we further hold the trial court did not abuse its discretion in appointing the Department as the managing conservator of Child. *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights). We overrule Father's fifth issue.

### III. CONCLUSION

We affirm the trial court's parental termination order.

Rebeca C. Martinez, Chief Justice